UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Floyd A. Quimby,
     Plaintiff,

     v.                            Civil Action No. 1:09-CV-20

Commissioner of Social Security,
     Defendant.


## REPORT AND RECOMMENDATION
### (Docs. 14 and 22)

Claimant Floyd Quimby brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review of the decision of the Commissioner of Social

Security ("Commissioner") denying his application for disability insurance benefits.

Pending before the Court are Quimby's Motion seeking an order reversing the

Commissioner's decision (Doc. 14), and the Commissioner's Motion seeking an order

affirming the same (Doc. 22).

For the reasons explained below, it is recommended that Quimby's Motion (Doc.

14) be DENIED, and the Commissioner's Motion (Doc. 22) be GRANTED.

### Quimby's Background/Procedural History

Quimby was born on December 13, 1953, and has a high school education.

(Administrative Record ("AR") 35-36, 38-39, 87, 1356.) He is a Vietnam-era and

peacetime veteran, having served in the Navy approximately from September 1971

through September 1975, August 1976 through September 1978, and October 1981

through June 1986.  (AR 137, 144, 1362.)  Quimby has worked as a housepainter, a cook, a window maker, and a custodian/janitor.  (AR 100-07, 133, 222, 377, 1362-63, 1366.)

### A.    Medical History

In December 1985, Quimby suffered trauma to his left knee while in the military service.  (AR 138.)  He was diagnosed with a medial collateral ligament strain, placed in a knee immobilizer for four weeks, given Motrin, and advised to begin rehabilitation within a few weeks of the injury.  (*Id.*)

In December 1994, Quimby injured his back while working as a custodian.  (AR 192, 209.)  Treating physician Dr. Daniel Wing noted that Quimby had "responded partially to ibuprofen," diagnosed Quimby with "mechanical spine pain," ordered "a few days rest with no work, no lifting anything more than a half gallon milk carton," and referred Quimby to work conditioning.  (AR 192-93, 203.)  In January 1995, Quimby had a second work-related back injury and was diagnosed with "[r]ecurrent low back muscle strain."  (AR 212.)  Tests revealed "[p]ossible degenerative disc disease" but "[n]o significant abnormality."  (AR 171.)  Treating physician Dr. Tony Petrillo stated that Quimby could return to work, but could lift no more than five pounds, needed to be able to sit and stand "ad lib," and "should not reach above or below his shoulders and waist."  (AR 212.)  In February 1995, Quimby reported that he was doing "somewhat better but having some problems with discomfort following his PT/exercise programs."  (AR 213.)  Dr. Petrillo noted that Quimby could return to work "with some modified duties not carrying more than 10 pounds, being able to stand and sit ad lib."  (*Id.*)  A February 1995

CT showed only mild abnormalities and reflected that Quimby's back injury was soft tissue/musculoskeletal in nature. (AR 207, 307.)

In April 1995, Quimby was treated with physical therapy and diagnosed with "mechanical spine pain." (AR 309.) In July 1995, Quimby underwent a work capacity assessment, and was assessed as being able to perform full-time sedentary or part-time light work with no lifting from below knuckle level, no overhead work, and changing positions every thirty minutes. (AR 180, 186.) In December 1995, Quimby entered a work-hardening program, and in February 1996 was assessed as being able to do sedentary light, probable full-time work with occasional lifts. (AR 196.) A 2001 MRI of Quimby's spine revealed no significant neural compromise at any level. (AR 192.)

By August 1995, Quimby had developed depression related to his back injury. (AR 215.) By 1996, Quimby was diagnosed with hepatitis C and diabetes. (AR 221-22.) For some time, Quimby was apparently able to control his diabetes with diet and medication, but an April 1999 note from treating physician Dr. Denise Hickey states that he was having "poor compliance which was likely fueled by his alcohol use." (AR 227.) Clearly, both Quimby's hepatitis and diabetes, and treatment therefor, were aggravated by Quimby's alcohol abuse. For example, a trial of Interferon for treatment of his hepatitis C was cut short due to his abuse of alcohol. (AR 221, 227, 256.)

From 2002 through 2004, Quimby experienced leg, foot, and knee pain, as well as jaw and lower back pain. (AR 256.) During this period, Quimby was on narcotics, and was not controlling his diabetes effectively. (*Id.*)

Of the more than 1,300 pages of documents contained in the administrative record, only approximately 150 pages consist of medical records from the insured period. (*See* AR 153-227, 298-310, 358-424.) The bulk of these 150 pages deal mostly with Quimby's extensive history of alcohol abuse and attempts to treat such abuse through detoxification. The records reveal that Quimby was hospitalized for alcohol abuse in each of the years from 1995 through 2002 and in 2004. (*See, e.g.*, AR 155, 201, 331, 350.) In March 1996, for example, Quimby sought detoxification from alcohol and reported that he had been "drinking fairly heavily since he was 16 years old," with his shortest period of sobriety being only "a couple of weeks." (AR 201.) At that time, Quimby reported that he was consuming "three to four six-packs of 16 ounce beers a day." (*Id.*) In addition, he was smoking "somewhat over two packs a day on a regular basis." (*Id.*) Tests at the time demonstrated an "[e]nlarged liver" and elevated liver function tests "consistent with alcoholic hepatitis." (AR 155.) Quimby again sought detoxification from alcohol in December 1999, and records from treatment indicate that he had been through "Quitting Time" twice by that time and had been sober for ten weeks prior to relapse. (AR 231.)

### B.      Self-Reporting

Quimby stated in a Function Report dated April 23, 2004 that he had good days and bad days, and on bad days his leg and back pain was so severe that he spent most of the day in bed trying to attain relief. (AR 98.) On good days, he was able to independently wash dishes, sweep, and vacuum once or twice a week for three-to-four hours at a time, although he needed to stop and rest every twenty-to-thirty minutes due to back and leg pain and fatigue. (AR 94.) He was able to prepare quick meals for himself, but he could

not stand at the stove very long and needed to take breaks.  (AR 95.)  Despite his ability to shop by himself, Quimby stated that he was unable to walk far and thus had to use an electric cart to shop.  (*Id.*)  He further stated that he enjoyed hunting and fishing, and tried to fish three-to-four times weekly and "road hunt[ed]."  (AR 97.)  Quimby complained, however, that he could not walk in the woods or follow brooks for fish due to his back and leg pain.  (*Id.*)

In an April 2004 Pain Report, Quimby reported that his back pain prevented him from working because he was unable to sit or stand for any amount of time and had to take breaks.  (AR 109.)  More specifically, he stated that he could not stand for more than fifteen minutes at a time.  (AR 111.)  He also stated that his pain was made worse if he did any amount of bending, sitting for too long, or trying to lift too much weight.  (AR 109.)  A letter from Quimby's wife, dated November 8, 2004, describes Quimby's foot and leg pain as "severe," explaining that in August 2003 he had a "by-pass in his right leg because of a circulation problem."  (AR 129.)  According to Quimby's wife, Quimby's condition worsened after the operation, to the point where he could not sit or stand for more than a few minutes at a time and could not walk "very much."  (*Id.*)  Quimby's wife also noted that Quimby had not drank alcohol for four years prior to the date of her letter, i.e., from approximately November 2000 through November 2004.  (AR 130.)

C.      **Procedural History**

On April 26, 2004, Quimby filed an application for disability insurance benefits alleging that the following conditions limited his ability to work from February 15, 1995, the alleged disability onset date, through June 30, 1999, his date last insured ("DLI"): foot,

leg, and back pain; hepatitis C; diabetes mellitus; depression; anxiety; panic attacks; and posttraumatic stress disorder ("PTSD"). (AR 87-90, 94, 1386.) The application was denied initially and on reconsideration. (AR 57-59, 61-63.) Quimby thereafter timely requested an administrative hearing, which occurred by video teleconference on January 6, 2005. (AR 1382-1400.)

On April 13, 2006, Administrative Law Judge ("ALJ") Matthew Gormley issued a decision finding that Quimby was not disabled, as defined in the Social Security Act, during the insured period. Specifically, the ALJ determined that, prior to June 30, 1999, Quimby "retained the physical functional capacity to perform work at the light level of exertion," and that, "[w]hen abstinent from alcohol, . . . [Quimby] retained the ability to perform even moderately complex and detailed job tasks." (AR 47-48.) Quimby requested review of ALJ Gormley's decision, and on June 20, 2007, the Appeals Council remanded the case for further proceedings, requiring the ALJ to: (1) further consider the treating, examining, and non-examining source opinions, and explain the weight given thereto, seeking additional evidence or clarification from such sources if necessary; (2) further evaluate Quimby's mental impairments, providing specific findings and rationale for each of the functional areas described in 20 C.F.R. § 404.1520a(c), considering the severity of Quimby's mental impairments both with and without the effects of alcohol dependence; (3) further consider Quimby's maximum residual functional capacity and provide rationale with specific references to the evidence to support his assessed limitations; (4) if warranted, obtain evidence from a vocational expert to clarify the effect of Quimby's assessed limitations on his occupational base, including asking the vocational

expert to identify examples of appropriate jobs and state the incidence of such jobs in the national economy; and (5) if appropriate, conduct further proceedings to determine whether alcoholism was a contributing factor material to any finding of disability, in accordance with 20 C.F.R. §§ 404.1535 and 416.935.  (AR 85-86.)

In May 2007, while Quimby's appeal of ALJ Gormley's decision was pending before the Appeals Council, Quimby's wife passed away.  (AR 1355.)  Sometime thereafter, Quimby began receiving disabled widower's benefits based on the earnings record of his deceased wife.  (AR 24.)  Although Quimby's application for these benefits is not part of the record, the Commissioner has represented, and Quimby has not denied, that the disability onset date for the widower's benefits was determined to be December 1, 2006.  (*See* Commissioner's Motion, Doc. 22, pp. 23-24.)

Pursuant to the June 2007 Order of the Appeals Council, on May 21, 2008, a second administrative hearing occurred via video teleconference.  (AR 1348-80.)  Quimby was represented by counsel, and vocational expert Deloris Jay attended and testified at the hearing.  (*Id.*)  Thereafter, on June 18, 2008, ALJ Robert Klingebiel issued a decision finding that Quimby was not disabled at any time from his alleged onset date through his DLI, June 30, 1999.  (AR 24-34.)  On December 23, 2008, the Appeals Council denied Quimby's request for review of ALJ Klingebiel's decision, thereby making the decision final.  (AR 8-11.)

On January 22, 2009, Quimby filed a Complaint against the Commissioner, initiating this action.

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is so engaged, he is not considered disabled. If the claimant is not engaged in substantial gainful activity, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires him to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984); *Gravel v. Barnhart*, 360 F. Supp. 2d 442, 445 (N.D.N.Y. 2005). If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g).

The claimant bears the burden of proving his case at steps one through four, *Butts v. Barnhart*, 388 F.3d at 383, and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift

to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity").

In 1996, the Social Security Act was amended to provide that: "An individual shall not be considered . . . disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); *see Porter v. Chater*, 982 F. Supp. 918, 921-22 (W.D.N.Y. 1997). Accordingly, 20 C.F.R. § 404.1535(a) states as follows: "If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." *See Warren v. Barnhart*, No. Civ. A. 03-3109, 2005 WL 1491012, at **8-9 (E.D. Pa. June 22, 2005). The "key factor" in this determination is "whether [the Commissioner] would still find [the claimant] disabled if [he or she] stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1); *see Warren*, 2005 WL 1491012, at *8. When considering whether the claimant would be disabled if he or she stopped using drugs or alcohol, the Commissioner evaluates two factors – which, if any, of the claimant's limitations would remain if he or she stopped using drugs or alcohol; and whether any or all of the remaining limitations would be disabling. *Warren*, 2005 WL 1491012, at *8 (citing 20 C.F.R. § 404.1535(b)(2)). Given that the claimant is the party best suited to demonstrate whether he or she would still be disabled in the absence of drug or alcohol addiction, the claimant "bears the burden of proving that [his or her] drug or alcohol addiction is not a contributing factor material to [his or] her disability." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999).

Employing this five-step analysis, including the additional requirements applicable to cases such as this which involve a drug or alcohol addiction, ALJ Klingebiel first determined that Quimby had not engaged in substantial gainful activity from his alleged onset date of February 15, 1995 through his DLI of June 30, 1999. (AR 27.) At step two, the ALJ found that Quimby had severe impairments of "status post back injury December 1994," alcohol abuse disorder, hepatitis C, type II diabetes mellitus, and "a history of derangement of the left knee." (*Id.*) Further, the ALJ determined that Quimby's impairments, including his substance use disorders, met Listings 12.04 and 12.09. (AR 29.) The ALJ then found, however, that if Quimby stopped his substance use, although he would continue to have severe impairments, these impairments would not meet or equal a listed impairment. (AR 29-30.) Next, the ALJ determined that if Quimby stopped the substance use, he would have the RFC to perform light work, with the following limitations: (a) he would need to perform such work primarily when sitting; (b) he would be able to use foot controls only occasionally; and (c) he would need to avoid more than unskilled tasks. (AR 31.)

In making his RFC determination, the ALJ considered Quimby's statements regarding the intensity, persistence, and limiting effects of his symptoms, and found that they were "not credible." (AR 32.) Having determined Quimby's RFC, the ALJ next found that, even if he stopped the substance use, Quimby still would not be able to perform his past relevant work. (AR 33.) However, considering Quimby's age, education, and work history, as well as the vocational expert's testimony, the ALJ found that, if Quimby stopped the substance use, he "would be capable of making a successful adjustment to

work that exists in significant numbers in the national economy[,]" including work as a bench assembly worker, a cashier, or a jewelry worker.  (AR 34.)

Given these findings, the ALJ determined that, although Quimby was under a disability, "a substance use disorder[] was a contributing factor material to the determination of disability at all times prior to June 30, 1999."  (AR 25.)  Therefore, the ALJ concluded that Quimby was not disabled at any time from the alleged onset date through his DLI.

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual review of the Commissioner's decision is limited to determining whether "substantial

evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore v. Astrue*, 566 F.3d at 305.

In determining whether an ALJ's findings are supported by substantial evidence, the court must consider "the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). Additionally, the court "'must . . . be satisfied that the claimant has had a full hearing under the Commissioner's regulations and in accordance with the beneficent purposes of the [Social Security] Act.'" *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). In reviewing the evidence, the court must determine if the ALJ set forth the "crucial factors" justifying his or her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Willis v. Comm'r of Soc. Sec.*, No. 6:05-CV-611, 2008 WL 795004, at *1 (N.D.N.Y. Mar. 24, 2008); *see also Ferraris v. Heckler*, 728 F.2d at 587.

The reviewing court's role with respect to the Commissioner's disability decision is "'quite limited[,] and substantial deference is to be afforded the Commissioner's decision.'" *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quoting *Burris v. Chater*, No. 94 Civ. 8049, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)). The court should not substitute its judgment for that of the

Commissioner. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). The Second Circuit explained: "The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that of the Secretary, and to reverse an administrative determination only when it does not rest on adequate findings sustained by evidence having 'rational probative force.'" *Williams v. Bowen*, 859 F.2d at 258 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. at 230). Therefore, if the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact finder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998).

Finally, the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits." *Jones v. Apfel*, 66 F. Supp. 2d at 522; *Dousewicz v. Harris*, 646 F.2d 771, 773 ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

Quimby contends that the ALJ made the following errors: (1) the ALJ denied Quimby's claim without complying with the June 2007 Appeals Council Order remanding the case for a second hearing and a new decision; (2) the ALJ failed to discuss or give weight to the decision of the Department of Veterans Affairs ("VA") that Quimby was

totally disabled; (3) the ALJ improperly ignored the opinions of treating physicians Drs. Durkin and Duggan; (4) the ALJ did not properly consider Quimby's February 2, 1996 work conditioning discharge report; and (5) the ALJ failed to follow the requirements of Social Security Ruling ("SSR") 83-20. (Doc. 14.) In its responsive Motion, the Commissioner refutes each of these alleged errors, arguing that the ALJ's decision is supported by substantial evidence and complies with the applicable legal standards. (Doc. 22.) For the reasons explained below, I find that the ALJ's decision is supported by substantial evidence, and Quimby's arguments to the contrary are unpersuasive.

## I.    Appeals Council Decision

As noted above, in an extensive order dated June 20, 2007, the Appeals Council remanded this matter with specific instructions regarding how the ALJ should conduct a second hearing, and what evidence the ALJ should consider and evaluate in a new decision. Quimby asserts that the ALJ failed to comply with these instructions, and thus the matter should again be remanded. Noteworthy, however, the Appeals Council itself was satisfied with the ALJ's new decision, finding no basis to review it. (AR 8.) Moreover, although the regulations state that the ALJ "shall take any action that is ordered by the Appeals Council," 20 C.F.R. § 416.1477(b), and although it is legal error for an ALJ to disregard the Commissioner's regulations, *see Hernandez-Devereaux v. Astrue*, 614 F. Supp. 2d 1125, 1134 (D. Or. 2009), the crucial inquiry remains whether substantial evidence supports the ALJ's decision. *See, e.g., Rembert v. Apfel*, No. CIV. A. 97-0318, 2000 WL 1196062, at *2 (S.D. Ala. Aug. 15, 2000) (affirming Commissioner decision where, despite ALJ's alleged non-compliance with remand order, Appeals Council was

satisfied with new decision and substantial evidence supported that decision); *Lancaster v. Sullivan*, No. 91 C 2842, 1992 WL 193557, at *2 (N.D. Ill. Aug. 3, 1992) (affirming Commissioner decision and finding that any error stemming from ALJ's failure to follow Appeals Council's remand order was harmless because substantial evidence supported ALJ decision).

Thus, to the extent that the ALJ here failed to properly follow the Appeals Council's instructions, he committed reversible error only to the extent that such error was not harmless, i.e., only to the extent that substantial evidence does not support the ALJ's ultimate conclusions. *Hernandez-Devereaux*, 614 F. Supp. 2d at 1134 (citing *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1197 (D. Or. 2004)). As discussed in detail below, substantial evidence supports the ALJ's decision, and thus any error with respect to the ALJ's failure to comply with the Appeals Council's instructions is harmless. Furthermore, the majority of the Appeals Council's instructions merely ordered the ALJ to comply with the Commissioner's regulations concerning, for example, consideration of the opinions of Quimby's treating physicians and analysis of Quimby's mental impairment. (*See* AR 85-86.) If the ALJ failed to meet his legal obligation to follow the regulations on these (and other) issues, he committed reversible error regardless of the Appeals Council's commands. *Hernandez-Devereaux*, 614 F. Supp. 2d at 1134. Whether the ALJ followed the relevant regulations with respect to each specific issue addressed in Quimby's Motion is discussed below and need not be separately evaluated on the grounds of noncompliance with the Appeals Council's instructions. *Id.*

## II. Treating Source Opinions

Quimby asserts that the ALJ failed to properly consider the opinions of his treating podiatrist, Dr. Joseph Duggan, and his treating internist, Dr. Mary Beth Durkin. Evaluation of physicians' testimony is governed by the "treating physician rule." As stated in 20 C.F.R. § 404.1527(d)(2), that rule provides that the ALJ must give a treating physician's opinion as to the claimant's disability "controlling weight," so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion, . . . that opinion will not be deemed controlling." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

Even when a treating physician's opinion is not given *controlling* weight, the opinion is still entitled to *some* weight, given that such physician "[is] likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). The factors that must be considered when the treating

physician's opinion is not given controlling weight include: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

As explained below, Dr. Duggan's opinion is not retroactive to the insured period, and both Dr. Duggan's and Dr. Durkin's opinions regarding Quimby's abilities and limitations during the insured period are not consistent with other substantial evidence in the record, including medical evidence. Therefore, although I find that the ALJ erred in failing to discuss these opinions and consider the above factors in assessing their weight (especially given the Appeals Council Order stating that, on remand, the ALJ must "provide rationale for the weight given th[ese] opinion[s]" (AR 84)), I conclude that the error is harmless, as Dr. Duggan's and Dr. Durkin's respective opinions are entitled to little weight and the record does not support a finding of disability.[1]

### A.      Dr. Duggan

In a January 30, 2006 Medical Source Statement ("MSS"), treating podiatrist Dr. Duggan opined that Quimby had "multiple neurologic and orthopedic issues," and that "[t]he arthritis of his right great toe joint is aggravated by activity." (AR 1335.) Dr. Duggan thus asserted that, although Quimby could lift and/or carry twenty pounds occasionally, he could stand and/or walk for "less than 2 hours in an 8-hour workday." (*Id.*) The Doctor further opined that Quimby's ability to push and/or pull was limited in

---

[1] For the same reason, although the ALJ's statement that "no treating or examining physician indicated that [Quimby] was disabled or unable to work during the [insured] period" was in err, the error is harmless. (AR 32.)

the lower extremities, given that "pushing forces excessive motion of the great toe joint."
(AR 1336.)  Dr. Duggan also noted that Quimby could occasionally balance, crouch,
crawl, and stoop; but he could never climb ramps or kneel, given his arthritis of the foot.
(*Id.*)

Quimby argues that the ALJ improperly failed to state the weight accorded to Dr.
Duggan's opinion.  Noteworthy, however, the opinion was rendered in January 2006, well
over six years after the DLI, and nothing in the opinion indicates that it was retroactive to
the insured period.  Although the existence of a disability can be proven by a retrospective
opinion, "such an opinion must refer clearly to the relevant period of disability and not
simply express an opinion as to the claimant's current status."  *Vitale v. Apfel*, 49 F. Supp.
2d 137, 142 (E.D.N.Y. 1999) (citing *Jones v. Sullivan*, 949 F.2d 57, 59-60 (2d Cir. 1991)).
Dr. Duggan's MSS uses the present tense, and thus explicitly assesses Quimby's functional
abilities on the date of its preparation – January 30, 2006 – and not during the insured
period.

The Second Circuit has held that, where a treating physician does not express an
opinion about a plaintiff's ability to work during the insured period, and the ALJ's denial
of benefits is supported by substantial evidence in the record, the physician's opinion is not
entitled to extra weight.  *See Jones v. Sullivan*, 949 F.2d at 60 ("Since none of the doctors
who treated Jones expressed an opinion about plaintiff's ability to work prior to [the DLI],
plaintiff's contention that the treating physician rule has been misapplied is without
merit.")  Moreover, where a treating physician's opinion is retrospective, it will not be
binding if it is contradicted by other medical evidence or "overwhelmingly compelling"

non-medical evidence. *See, e.g., Saviano v. Chater*, 956 F. Supp. 1061, 1069 (E.D.N.Y. 1997). A retrospective opinion of a currently treating physician "must be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether[,] considered in light of the entire record, it establishes the existence of a physical impairment [*during the alleged period of disability*]." *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (emphasis added) (internal quotations omitted).

Here, although the ALJ erred in failing to specifically reference Dr. Duggan's 2006 MSS in his written decision, it is clear from the transcript of the May 2008 administrative hearing that the ALJ was aware of and reviewed such MSS prior to issuing a decision. (AR 1352-54.) Moreover, Dr. Duggan's MSS does not establish the existence of a physical impairment *during the alleged period of disability*. Therefore, I find that the ALJ's error was harmless. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."); *see also Fitzgerald v. Astrue*, No. 2:08-CV-170, 2009 WL 4571762, at *10 (D. Vt. Nov. 30, 2009) (holding that remand would be inappropriate because application of the correct legal principles could lead only to the conclusion that the evidence at issue was irrelevant to the disability decision). Furthermore, the rationale for the ALJ's implied conclusion that no weight should be accorded to Dr. Duggan's 2006 MSS can easily be "glean[ed]" from the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (D. Vt. 1983) ("When . . . the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the court] do[es] not require that he have mentioned every item of testimony presented to him or have explained

why he considered particular evidence unpersuasive or insufficient to lead him to a

conclusion of disability.")  Specifically, the ALJ noted in his decision that, although there

was evidence that Quimby had a foot problem in 2003 and was treated by a podiatrist, "the

record contains no evidence that [Quimby] had complaints of foot pain at any time relevant

to th[e ALJ's] decision."  (AR 32.)  After reviewing the evidence, the Court agrees that

there is no evidence of a foot problem prior to the DLI, and thus Dr. Duggan's 2006

opinion is entitled to little, if any, weight.[2]

Quimby also argues that the ALJ did not correctly identify Dr. Duggan as the

physician who rendered the January 2006 MSS.  The ALJ did in fact erroneously refer to

Dr. Durkin instead of Dr. Duggan as Quimby's podiatrist.  (AR 32 ("[R]ecent records

show that [Quimby] was treated by podiatrist Dr. M. Durkin as of March 2004.").)  This

error was also harmless, however, as the fact remains that Dr. Duggan did not opine on

Quimby's foot problems during the relevant period, and in fact, there is no evidence of a

foot impairment on or before Quimby's DLI.  Furthermore, at the May 2008 administrative

hearing, there was discussion about the identity of the author of the January 2006 MSS,

and it was noted that such MSS may have been prepared by Dr. Duggan, Quimby's

podiatrist, and not Dr. Durkin, Quimby's internist.  (AR 1352-54.)

Finally, Quimby contends that the ALJ should have "recontact[ed]" Dr. Duggan to

clarify the meaning of his January 2006 opinion "if he did not understand why the doctor[]

concluded that Quimby was unable to be on his feet, standing and/or walking for even two

hours per day as needed to perform work at even the sedentary levels or to work full time."

---

[2] In coming to this conclusion, both the Court and the ALJ (*see* AR 32) also considered the
retrospective opinions of state agency physicians Drs. Abramson and Frommelt, both of whom determined
that, based on the record evidence, Quimby was able to work during the insured period.  (AR 275-96.)

(Doc. 14, p. 6.) The regulations provide, however, only that an ALJ should seek additional information when the evidence received from the claimant's treating physician is inadequate for the ALJ to determine whether the claimant is disabled. *See* 20 C.F.R. §§ 404.1512(e), 404.1527(c)(3). Here, there is no indication that the ALJ either did not understand Dr. Duggan's opinion or required additional information in order to make a disability determination.

### B.    Dr. Durkin

On May 9, 2008, treating internist Dr. Durkin opined in a MSS that, from on or before June 30, 1999 (the DLI) until the date of the report, a part-time sedentary job would be "<u>helpful</u>" to Quimby's "overall well-being," but he was incapable of "engaging in activities which are work related for 8 hours a day, 5 day[s] a week or an equivalent work schedule." (AR 1341.) Additionally, the MSS lists the following factors which "might interfere" with Quimby's "ability to engage in work-related, sustained activities:" (a) use of narcotics to treat chronic pain syndrome; (b) depression; (c) bereavement due to the death of his wife in May 2007; and (d) use of anxiety medication. (*Id.*)

Citing non-Second Circuit case law holding that an ALJ "may not ignore evidence inconsistent with his opinion without explanation," *see, e.g., Martin v. Apfel*, 118 F. Supp. 2d 9, 15 (D.D.C. 2000), Quimby asserts that the ALJ improperly failed to mention Dr. Durkin's MSS. (Doc. 14, p. 6.) Preliminarily, it is noteworthy that the ALJ was aware of and reviewed such MSS prior to issuing a decision. (AR 1352-54.) More importantly, however, there are several deficiencies in Dr. Durkin's MSS. First, as noted above, the MSS was rendered in May 2008, almost nine years after Quimby's DLI. Second, although

the MSS indicates that it relates to the period from on or before the DLI until the date of its preparation,[3] Dr. Durkin noted therein that she had cared for Quimby only since March 2004, almost five years after the DLI. When a retrospective opinion is offered by a physician who was not treating the claimant during the relevant period and the opinion is contradicted by medical evidence in the record, it is not entitled to great weight. *Vitale v. Apfel*, 49 F. Supp. 2d at 143.

Finally, Dr. Durkin's opinion that the factors listed in her MSS interfered with Quimby's ability to work during the insured period is contradicted by substantial medical and other evidence in the record. Specifically, Quimby's ability to engage in work-related activities during the insured period could not have been affected by the death of his wife, as such death did not occur until May 2007, over seven years after the DLI. Moreover, Dr. Durkin stated that Quimby's use of narcotics to treat his chronic pain syndrome affected his ability to work, but the medical evidence reveals that Quimby was not treated for chronic pain syndrome and was not taking narcotic medications during the insured period. (AR 154, 167, 169, 178, 195, 204, 220, 224, 313, 315, 332, 350, 377.) Dr. Durkin also stated that Quimby's medications during the insured period included Methadone, Oxycodone, and Clonazepam, but the medical records do not reflect that Quimby was taking those medications during the insured period. (*Id.*)

---

[3] Oddly, the MSS states that it represents Dr. Durkin's opinion as to Quimby's psychological limitations "from on or before June 30, 1999 to the present." (AR 1341.) Taken literally, this means that the opinion encompassed either: (a) the time period from June 30, 1999, the DLI, until the date of the report, the only relevant day from that time period, for disability purposes, being June 30, 1999; or (b) Quimby's entire lifetime up to the date of the report, the only relevant dates from that time period being those on or between February 15, 1995 and June 30, 1999. Either way, the opinion's reliability is less than it would have been had it been targeted towards the specific period from *February 15, 1995 through June 30, 1999*.

Additionally, Dr. Durkin's opinion that Quimby's depression affected his ability to work during the insured period is not supported by the record. Rather, the record indicates that, during the insured period, Quimby "denie[d] any psychiatric problems, or psychiatric treatment[,]" and advised a treating source that he had "[n]o history of depression or symptoms of mania, anxiety or PTSD." (AR 376.) Despite these statements, the record does include several complaints of depression during the insured period (*see, e.g.,* AR 181, 191, 208, 215), but the depression was specifically attributed to Quimby's back pain (*see* AR 191 "[Quimby] denies a history of depressive disorders . . ., suggesting back injury and adjustment difficulty as causal to his current depressed mood."), and it was noted that Quimby was "responding" to anti-depressant medication (AR 215).

With respect to Quimby's back pain, as the ALJ noted in his decision, Quimby "was not treated with strong narcotic medications for [his back] condition during the [insured] period," and "was not described as having any severe symptoms of pain when he was hospitalized for detoxification from alcohol in December 1999." (AR 32, 231-33.) Further, with respect to Quimby's depression, a treatment note dated September 1, 1995 states that, although Quimby was "feeling frustrated with the system and still concerned about his back pain," after being on anti-depressant medication for approximately six weeks, "he feels that the quality of his sleep has improved some[,]" and "[h]is affect is somewhat lighter, he is a bit more optimistic . . . ." (AR 215.) A November 1, 1995 treatment note reports that Quimby "had been doing rather well and certainly feels that the [medication] . . . has made him feel better." (AR 216.) The note continues: "[Quimby] feels as though he does not need an increase in his antidepressant medication[,]" and "[h]e

is anxious to return to the work force." (*Id.*)  Similarly, an earlier treatment note dated July 7, 1995 states that Quimby's depression "would not preclude his participation in a work hardening or conditioning program with a goal of returning to work within realistic limits of his physical capabilities . . . ."  (AR 181.)

Dr. Durkin further opined that anxiety medication affected Quimby's ability to work during the insured period, but the medical evidence does not reflect that Quimby was consistently treated for anxiety on or before the DLI.  Although there are treatment notes in the record which indicate that Quimby complained of anxiety and feeling "jittery" during the insured period, those complaints were made while Quimby was going through "detox" and experiencing alcohol withdrawal.  (AR 381, 386, 397, 401-02, 418, 421, 424.)

Therefore, although Dr. Durkin's MSS states that it relates to the insured period, substantial evidence refutes that proposition.  As such, I conclude that the ALJ's failure to reference Dr. Durkin's opinion was harmless error, for the same reasons stated above with respect to Dr. Duggan's opinion.  Also for the same reasons stated above, I find that the ALJ had no duty to "re-contact" Dr. Durkin to clarify her opinion.

### III.    Veterans Administration Disability Ratings

On August 30, 2001, the VA issued a Rating Decision on Quimby's claim for disability due to hepatitis C, type II diabetes mellitus, PTSD, and a left knee condition. (AR 144-49.)  The VA deferred a decision on Quimby's diabetes, PTSD, and knee, but determined that his hepatitis C had increased from ten percent disabling to sixty percent disabling.  (AR 144.)  On April 25, 2002, the VA issued another Rating Decision, this time solely on Quimby's claim for disability due to "internal derangement, left knee,"

determining that such injury was ten percent disabling.  (AR 137-39.)  Quimby contends that the ALJ committed legal error by failing to give any evidentiary weight to these VA Decisions.

The Social Security Administration ("SSA") is not bound by a disability determination made by another governmental agency because other agency disability determinations are based on rules that differ from the ones used by the SSA in disability cases.  20 C.F.R. § 404.1504; *see* SSR 06-03p, 2006 WL 2329939, at *7 (S.S.A. Aug. 9, 2006) (holding that, although the SSA is not bound by the disability decisions of non-SSA agencies, "the adjudicator should explain the consideration given to these decisions in the notice of decision").  Although some circuits have held that non-SSA disability determinations are entitled to "great weight," *see, e.g., McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002); *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000), the Second Circuit has held that such determinations are entitled to only *some* weight, *see Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975) ("While the determination of another governmental agency that a social security disability benefits claimant is disabled is not binding on the Secretary, it is entitled to some weight and should be considered.");  *Stieberger v. Sullivan*, 738 F. Supp. 716, 744 (S.D.N.Y. 1990).  Recently, in *Machia v. Astrue*, No. 2:08-CV-103, 2009 WL 3806326, at *9 (D. Vt. Nov. 16, 2009), this Court discussed the purpose behind the Second Circuit's approach, explaining: "The point of the Second Circuit's admonition to accord VA determinations 'some weight' is that in addition to the oral testimony and medical evidence, VA rating decisions are another item to be placed on the evidentiary scale . . . ."

Applied here, the VA's 2001 and 2002 Rating Decisions are not binding on the ALJ or the Court, and they are not entitled to "great" weight. They are, however, entitled to some weight. Although the ALJ mentioned the 2002 VA disability determination in his written decision (*see* AR 28),[4] he did not mention the 2001 determination, and he failed to state what, if any, weight he attributed to either Rating Decision. Given the law set forth above, the ALJ committed plain error by failing to give any consideration to the 2001 VA Rating Decision and failing to state what weight he accorded to either the 2001 or 2002 Decision. *See, e.g. Longbardi v. Astrue*, No. 07 Civ. 5952, 2009 WL 50140, at *22 (S.D.N.Y. Jan. 7, 2009) ("Courts in this Circuit have long held that an ALJ's failure to acknowledge relevant evidence or explain its implicit rejection is plain error.") (internal quotation omitted). As explained below, however, I conclude that the error is harmless, as no reasonable administrative factfinder, following the correct legal principles, could have resolved the matter in any way other than the ALJ did. *See Johnson v. Bowen*, 817 F.2d at 986; *Fitzgerald v. Astrue*, 2009 WL 4571762, at *10. Moreover, the ALJ's reasoning can be "glean[ed]" from his detailed decision. *Mongeur v. Heckler*, 722 F.2d at 1040.

## A.     Hepatitis C

The August 2001 Rating Decision, which assigned Quimby a sixty percent disability rating based on Quimby's hepatitis C, was made effective from January 24, 2001, well over one year after the DLI. (AR 144.) Moreover, the earliest evidence upon which the Decision was based is dated May 2000, nearly one year after the DLI. (AR 145.) The Decision notes that VA treatment records from August 2000 revealed that

---

[4] The ALJ also mentioned in his decision that Quimby "began receiving Veteran's Benefits in June 1999 at a rate of 10% [which] was later raised to 100%." (AR 32.)

Quimby lost approximately thirty pounds from March 2000 to August 2000 or 2001.[5] (AR 145.) The Decision further states that liver function tests dated June 3, 2001 were "markedly elevated," and that Quimby's liver was "extremely enlarged, firm and tender." (AR 145-46.) The Decision also notes that there was "some evidence" of "muscle wasting of the biceps, triceps, quads, and calves. (*Id.*) Considering this evidence, based on an examination conducted on August 9, 2001, the VA concluded that Quimby "suffer[ed] from massive fatigue and weakness unrelieved by rest," and diagnosed him with hepatitis C "with increased fatigue, depression and joint pain." (AR 146-47.)

None of the evidence cited by the VA in support of the assessed disability rating regarding Quimby's hepatitis C is from the insured period. Moreover, the ALJ acknowledged in his decision that Quimby was diagnosed with hepatitis C in 1996, and underwent treatment for such illness for six weeks in 1998. (AR 28.) The ALJ further acknowledged that Quimby "ha[d] an enlarged liver with elevated liver function tests consisted with alcoholic hepatitis," and that Quimby stopped his treatment for hepatatis "due to side-effects and [Quimby's] continued alcohol abuse." (*Id.*)

Taken as a whole, the evidence demonstrates that Quimby's hepatitis C was not disabling during the insured period, particularly to the extent that it was controlled with medication and not ignored or exacerbated as a result of Quimby's alcohol disorder. For example, a September 2000 progress note reveals that Quimby's treating primary care physician at the time, Dr. Peter Mogielnicki, opined that Quimby's hepatitis C "is presently not active." (AR 555.) Moreover, a July 1998 treatment note indicates that,

---

[5] Initially, the Decision states that Quimby lost thirty pounds "from March 2000 to August 00," but it later states that Quimby lost thirty-five pounds from March 2000 to "August 2001." (AR 145.)

when presenting for alcohol detoxification, Quimby reported that he had "stopped taking his medications," including medication for hepatitis C (Interferon), because he had become "fed up" with them as well as with his illness.  (AR 221.)  An April 1999 treatment note states that it was not recommended that Quimby continue treatment for hepatitis C, "given his ongoing alcohol use."  (AR 227.)

Notably, the same July 1998 treatment note mentioned above states that Quimby was "work[ing] as a cook" at that time.  (AR 222.)  Likewise, a progress note from that time period, July 1998, states that Quimby reported that he was working "very long hours," demonstrating that, in fact, Quimby was able to work during the insured period.[6] (AR 393.)  A February 1999 progress note similarly indicates that Quimby reported that he "work[ed] as a painter in the summer."  (AR 377.)  As the ALJ observed, the September 2000 progress note mentioned above indicates that Quimby had reported that he had been working at a house painting job prior to that date.  (AR 32, 555.)  The ALJ stated: "[Quimby] did assert that he was laid off from this job, but his complaint was not that he was unable to perform this laborious work, but that he became 'fatigued by the end of the day.'"  (AR 32.)  The ALJ implied that Quimby's statements regarding fatigue (*see, e.g.,* AR 1363, 1365-66) were not entirely credible, accurately stating: "[Quimby] did not report the need to nap during the day to any treating or examining physician."  (AR 32.)  The ALJ's finding regarding Quimby's complaints of fatigue is well-supported and shall not be disturbed.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) ("Congress has instructed us that the factual findings of the Secretary, if supported by substantial evidence,

---

[6] In this July 1998 progress note, social worker Lisa Ehrlich reported: "We discussed the difficulty in applying for SSDI and in establishing suficent (sic) disability . . ., as Mr. Quimby's medical condition is fairly stable.  We discussed the possibility of finding a better paying job."  (AR 393.)

shall be conclusive.") (citing 42 U.S.C. §§ 405(g), 1383(c)(3); *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982)).

Accordingly, I conclude that the VA Rating Decision regarding Quimby's hepatitis C was entitled to little weight, and the ALJ's failure to state this fact was harmless error. Although the evidence clearly demonstrates that Quimby had been diagnosed with hepatitis C before the DLI, there is no evidence to support a finding that such condition was disabling on or before that date. *See Fitzgerald v. Astrue*, 2009 WL 4571762, at *10 (holding remand unnecessary where there is no evidence linking a VA disability determination with claimant's insured period); *accord Machia v. Astrue*, 2009 WL 3806326, at **7-9.

In Quimby's Opposition to the Commissioner's Motion, Quimby contends that, because the ALJ determined that the hepatitis C was a "severe" condition which "had more than minimal affect on [Quimby's] ability to perform basic work functions" (AR 29), he was required to also find that the condition "significantly limit[ed] [Quimby's] ability to do basic work activities." (Doc. 26, pp. 4-5.) This contention is incorrect. The fundamental effect of an ALJ's determination at step two in the five-step sequential process that a claimant has one or more "severe" impairments is that the ALJ must proceed to the third step in the process. *See* 20 C.F.R. § 404.1520(a)(4) ("The sequential evaluation process is a series of five 'steps' that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step.") Once the ALJ proceeds past step two, his "severity"

findings largely become irrelevant.  Stated differently, the fact that an ALJ makes a

"severity" finding with respect to a particular impairment at step two does not necessarily

mean that such impairment imposes functional limitations on the claimant which must be

incorporated into the claimant's RFC.  In *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx.

425, 427-28 (6th Cir. 2007), the Sixth Circuit considered and rejected an argument similar

to the one raised by Quimby here:

> Griffeth's second contention is that the ALJ's analysis was internally
> inconsistent because he classified Griffeth's impairment as "severe" but
> treated it as "non-severe."  At step two of the sequential evaluation process
> the ALJ determined that because Griffeth's depression was a medically
> determinable impairment that caused "some" limitations of his ability to
> perform "some" basic work-related activities, it was a "severe" impairment.
> Later in his analysis he determined that Griffeth's depression had only a
> minimal effect on his ability to concentrate.
>
> . . .
>
> The ALJ did not misinterpret the severity regulation.  At step two
> "significant" is liberally construed in favor of the claimant.  The regulations
> provide that if the claimant's degree of limitation is none or mild, the
> Commissioner will generally conclude the impairment is not severe, "unless
> the evidence otherwise indicates that there is more than a minimal limitation
> in your ability to do basic work activities."  20 C.F.R. § 404.1520a(d).  *The
> purpose of the second step of the sequential analysis is to enable the
> Commissioner to screen out "totally groundless claims."  We have construed
> the step two severity regulation as a "de minimis hurdle" in the disability
> determination process.*  Under a Social Security policy ruling, if an
> impairment has "more than a minimal effect" on the claimant's ability to do
> basic work activities, the ALJ is required to treat it as "severe."  SSR 96-3p
> (July 2, 1996).
>
> *The ALJ's determination that Griffeth's depression caused "some"
> limitation of his ability to do work activity is consistent with a finding that
> Griffeth's depression caused more than a minimal limitation in his ability to
> do basic work activities.  The ALJ's finding that the limitation was more than
> minimal, however, was not inherently inconsistent with his finding that the
> limitation has "little effect" on the claimant's ability to perform basic work[-
> ]related activities.*  Because the ALJ gave Griffeth the benefit of the doubt at
> step two of the sequential analysis, the ALJ went on to consider not only

Griffeth's "severe" impairments, but all of Griffeth's other impairments as well, and made his determination based upon the effects of the combination of impairments on Griffeth's ability to perform basic work-related activities. This expanded review worked to Griffeth's benefit, not to his detriment.

(Internal citations omitted) (emphasis added); *see also Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir. 2001) ("The ALJ's finding that Boyd had 'a combination of impairments that is severe' did not foreclose a finding that Boyd had a residual functional capacity to perform a range of light work, and is not necessarily inconsistent with that finding."); *Yang v. Comm'r of Soc. Sec.*, No. 00-10446-BC, 2004 WL 1765480, at *5 (E.D. Mich. Jul. 14, 2004) ("A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other.").

**B.    Left Knee**

As noted above, in an April 2002 Rating Decision, the VA assigned Quimby a ten percent disability rating based on "internal derangement" of his left knee. (AR 137.) The Decision was based on medical evidence dating from 1985, and was made effective as of May 16, 2000. (*Id.*) Noting reference in the service medical records to a knee injury which occurred in December 1985 when a "ramp/hatch gave way" as Quimby stepped onto it to get onto a boat, the Decision explains that Quimby was examined on January 17, 2002 to determine the etiology of his knee condition. (AR 138.) The Decision further notes that Quimby "complains of pain in the left knee with associated weakness intermittently, stiffness, instability, fatiguability, and lack of endurance. . . . He states his left knee constantly aches and he gets a sharp pain like 'jabbing a knife' into his joint, which makes him feel like his left knee will give out." (*Id.*) The Decision concluded with the diagnosis of "mild degenerative changes, left knee, as likely as [sic] not related to in-

service injury in 1985 and internal derangement, left knee, including chondromalacia[7] and medial collateral ligament injury, likely as a result of in-service injury occur[ing] in 1985." (AR 139.) Assigning a 10 percent disability rating due to the knee condition, the VA stated that "[m]edical evidence supports the 10 percent evaluation because of degenerative changes with painful motion." (*Id.*)

Although this Rating Decision referred to medical records dating back to 1985, it was primarily based on the results of an examination that took place on January 17, 2002, over two years after the DLI. (AR 138-39.) Moreover, even considering the 1985 evidence, the VA determined that the Decision was not effective until May 2000, nearly one year after the DLI. (AR 137.) There is no discussion in the Decision regarding why it was made effective on that date and not before.

The ALJ's decision considers the very same evidence considered by the VA in its Rating Decision, but in the context of social security disability regulations and guidelines rather than veterans administration guidelines. Specifically, the ALJ noted in his decision that Quimby had suffered trauma to his left knee in December 1985 while in military service, and at the time, was diagnosed with "a medical collateral ligament strain." (AR 28.) The ALJ continued:

> Although there are no primary records of medical treatment for this condition during the [insured period], the claimant was evaluated in April 2002 by the Veteran's Administration pursuant to his claim for Veteran's Benefits. At that time he complained of ongoing knee pain with flares of symptoms 2-3 days per week. He did have tenderness to palpation, but maintained a normal gait. X-rays showed mild joint space narrowing. The claimant was assessed with a 10% limitation.

---

[7] "Chondromalicia" is defined as "[s]oftening of any cartilage." STEDMAN'S MEDICAL DICTIONARY 369 (28th ed. 2006).

(*Id.*)  Later in the decision, the ALJ stated that, although Quimby "did injure his left knee

in 1985; . . . there is no evidence that he sought any treatment for this complaint during the

[insured period]."  (AR 30.)  The ALJ further stated that Quimby maintained a stable gait

after the injury, and was not using crutches or a cane in April 2002.  (*Id.*)  Moreover, the

ALJ continued, Quimby acknowledged that in April 2004, nearly five years after the DLI,

he "was able to wash dishes, sweep, vacuum, care for his personal needs without

assistance, cook[,] and even climb stairs albeit . . . slowly."  (*Id.*)  Thus, the ALJ concluded

that the medical evidence "does not establish that the claimant had an impairment of the

left knee which prevented him from ambulating effectively."  (*Id.*)  Further, and in

consideration of the opinions of state agency physicians Drs. Abramson and Frommelt, the

ALJ found that Quimby was not disabled or unable to work due to his knee injury or any

other medical or psychological problem(s) other than alcohol abuse during the insured

period.  (AR 29-32.)

Quimby argues that the ALJ erred in finding that Quimby's knee condition

amounted to a "severe" impairment, while at the same time failing to determine what

limitations derived from such condition.  (*See* Doc. 26, p. 3.)  As explained above,

however, the fact that a claimant has a severe impairment does not necessarily mean that

such impairment imposes functional limitations on the claimant which must be

incorporated into the claimant's RFC.  *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx.

at 427-28; *Boyd v. Apfel*, 239 F.3d at 706; *Yang v. Comm'r of Soc. Sec.*, 2004 WL

1765480, at *5.  Therefore, the ALJ was not required to assess what functional limitations

resulted from Quimby's knee condition.  Moreover, it was proper for the ALJ to conclude

that, given the lack of treatment records regarding Quimby's knee condition during the insured period (and the many treatment records during the insured period regarding other problems, including alcoholism), Quimby experienced no functional limitations as a result of such injury during that period. *See Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989) (holding that "Secretary properly attributed significance to [claimant's] failure to seek any medical attention during the crucial . . . period," and that claimant's failure to present medical evidence from that period "seriously undermines his contention that he was continuously disabled during that time"). One court stated: "To be sure, the ALJ is permitted to attach significance to plaintiff's failure to seek medical treatment." *Mahoney v. Apfel*, 48 F. Supp. 2d 237, 246 (E.D.N.Y. 1999); *see also Fitzgerald v. Astrue*, 2009 WL 4571762, at *10.

For these reasons, I find that the VA Rating Decision regarding Quimby's knee condition was entitled to little weight, and the ALJ's failure to explicitly state this fact was harmless error.

## IV.     Work Conditioning Report

Quimby alleges that the ALJ did not properly consider his February 2, 1996 work conditioning discharge report. (*See* AR 196-98.) That report states that Quimby had injured his back in December 1994 while working as a custodian, and that, although he stated an interest in continuing with janitorial work and in fact "demonstrate[d] an ability to perform this type of work on a sedentary light level," he would not be able to "tolerate the use of buffers, or carry[] heavy mop buckets or trash containers at this time." (AR 197.) The report further states that Quimby could lift fifteen pounds occasionally, and

nineteen-and-one-half pounds rarely; was to avoid lifting below knuckle level and limit overhead lifting to light tasks; and was to "change position every 30 minutes."  (AR 196.)  The report concludes that Quimby demonstrated a "probable" ability to work "full time" at the "sedentary light physical demand level," and notes that Quimby was "encouraged to work with his vocational counselor regarding job placement."  (AR 196, 198.)  In an earlier July 1995 functional capacity evaluation report, Quimby was described similarly as having the capacity for "[f]ull time sedentary[,] part time light physical demand level [work] with no lifting from below knuckle level, no overhead work[,] and changing positions about every 30 min[untes]."  (AR 180.)  That report further stated that Quimby's "[p]otential" was for "[f]ull time light physical demand level [work], perhaps higher," which would not allow him to return to his former position but "may be enough for some custodial positions."  (*Id.*)

The ALJ discussed and considered both the July 1995 and February 1996 reports in his decision.  Specifically, the ALJ noted that Quimby underwent a work capacity assessment in July 1995, "and was found to have the functional capacity for full-time sedentary work and for part-time light work with no lifting below knuckle level, no overhead work and with the need to change positions every 30 minutes."  (AR 27.)  The ALJ further noted that Quimby entered a work-hardening program in December 1995, and "[a]fter seven weeks of treatment he was considered to have a 'sedentary light' functional level, lifting 15 pounds occasionally and 19.5 pounds on a rare basis, with the need to avoid lifting below knuckle level, to limit lifting overhead to light tasks and to change positions every 30 minutes."  (*Id.*)  The ALJ also stated that, during his work-hardening

training, Quimby was described as "having no problems with instructability, timeliness, adherence to rules, accepting supervision, following directions, working appropriately with others and accepting responsibility." (*Id.*) Later in the decision, the ALJ again stated that Quimby had problems standing and sitting, and "could sit ½ hour and then needed to move around." (AR 32.) But the ALJ questioned the credibility or permanence of this fact, noting that Quimby "did not report such severe symptoms after attending work-hardening." (*Id.*; *see also* AR 219-27, 358-424.) In fact, in February 1997, approximately one year after the February 1996 work conditioning report was prepared, upon Quimby's presentation to the ER for acute alcohol detoxification, treating physician Dr. Mogielnicki observed that Quimby was "ambulating [and] performing activities of daily living independently." (AR 220.)

Quimby asserts that the ALJ should have included the need to change positions every thirty minutes in his assessment of Quimby's RFC. Instead, the ALJ determined that, during the insured period, Quimby retained the functional capacity for light work that is primarily performed when sitting but does not require more than occasional use of foot controls or the performance of more than unskilled tasks. (AR 31.) The ALJ did not find that Quimby needed to change positions every thirty minutes. Substantial evidence supports this conclusion. That evidence includes, as discussed above and as noted in the ALJ's decision, evidence reflecting that: (a) Quimby was working during the insured period; (b) Quimby's back pain was not treated with narcotic medications during the insured period; (c) Quimby did not complain to his treating physicians about any foot or other severe pain during the insured period; and (d) none of Quimby's treating physicians

during the insured period opined that Quimby needed to change positions every thirty minutes.

The ALJ clearly considered all the relevant evidence, including Quimby's subjective complaints and the February 1996 work conditioning report, and made factual findings based thereon. These "[f]actual findings . . . are within the sound discretion of the ALJ, and th[e] Court will defer to [them]." *Jerome v. Astrue*, No. 2:08-CV-98, 2009 WL 3757012, at \*14 (D. Vt. Nov. 6, 2009) (quotation marks omitted). The ALJ was not required to accord any weight to the functional limitations stated in the work conditioning discharge reports, as they were not prepared by treating physicians, but rather by "industrial rehabilitation therapists" (*see, e.g.,* AR 198), and thus they are not covered by the treating physician rule. Quimby's contention that an ALJ cannot base his decision on an absence of evidence in the record is mistaken. In fact, as pointed out by the Commissioner, the Second Circuit has held that, although a "dearth of contemporaneous evidence" does not "*necessarily*" preclude a finding of disability, *Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989), "[t]he Secretary is entitled to rely not only on what the record says, but also on what it does not say," *Dumas v. Schweiker*, 712 F.2d at 1553; *Hall v. Astrue*, No. 06-cv-1000(NGG), 2009 WL 2366891, at \*8 (E.D.N.Y. Jul. 31, 2009). Finally, as noted above, the February 1996 work conditioning report itself indicates that, despite the limitation that Quimby should change positions every thirty minutes, he still maintained the capacity to work. (AR 196-98.)

## V.    SSR 83-20

Quimby contends that the ALJ erred in failing to comply with SSR 83-20 (hereafter "the Ruling")'s requirement to infer an onset date.  In cases like this, where a claimant has already been found disabled under another title of the Social Security Act, SSR 83-20 requires the ALJ to determine the onset date of disability.[8]  The Ruling applies here because, as the ALJ explained, "[r]ecords establish that [Quimby] has been receiving disabled widow's insurance benefits based upon the earnings record of his deceased spouse."  (AR 24.)

The ALJ did in fact fail to refer to SSR 83-20 and to follow the Ruling's specific mandate to determine an onset date of Quimby's disability.  Courts have held, however, that an ALJ's failure to explicitly rely on SSR 83-20 is harmless error, to the extent that the dictates of the decision are nonetheless followed.  *See, e.g., Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("The ALJ did not refer to SSR 83-20 specifically in his decision, but this omission by itself is not reversible error.  We must determine whether the ALJ nevertheless properly applied the requisite analysis."); *Godsey v. Astrue*, No. 08-410-P-S, 2009 WL 1873528, at *3 (D. Me. Jun. 29, 2009); *Field v. Shalal[a]*, No. CIV. 93-289-B, 1994 WL 485781, at *3 (D. N.H. Aug. 30, 1994) ("The ALJ's failure to explicitly rely on SSR 83-20 does not by itself require remand.  In this case, however, the ALJ's reasoning also fails to comport with SSR 83-20's substantive requirements.")  More specifically, courts have held that an ALJ's failure to follow SSR 83-20's mandate to determine an onset date is harmless error, where the ALJ finds that the

[8] "Social Security Rulings are agency rulings 'published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.'"  *Sullivan v. Zebley*, 493 U.S. 521, 531, n. 9 (1990) (quoting 20 CFR § 422.408 (1989)).

onset date post-dated the date last insured; substantial evidence supports that finding; and the decision generally comports with the analysis set forth in SSR 83-20. *See, e.g., Nelson v. Barnhart*, No. 04-193-P-H, 2005 WL 1231500, at *2 (D. Me. May 24, 2005) (ALJ's failure to determine onset date and alternative assessment of whether claimant was disabled as of the date of last insured was not reversible error, as evidence supported finding that onset date post-dated date last insured); *Ware v. Barnhart*, No. 03-170-B-W, 2004 WL 1529266, at **2-3 (D. Me. Jun. 24, 2004) (while ALJ never explicitly determined claimant's onset date, no reversible error resulted, as ALJ implicitly found that onset date post-dated date of last insured; substantial evidence supported that finding; and ALJ's decision comported with SSR 83-20 in other material respects).

In this case, the ALJ did not determine Quimby's onset date because he found that, although Quimby was "under a disability," his substance abuse "was a contributing factor material to the determination of disability at all times prior to June 30, 1999." (AR 25.) Accordingly, the ALJ concluded that Quimby "is not entitled to disability insurance benefits at any time from his alleged onset date of February 15, 1995 through the date he was last insured of June 30, 1999." (*Id.*) *See* 20 C.F.R. § 404.1535 ("If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability."); *Warren v. Barnhart*, 2005 WL 1491012, at **8-9. As discussed above, I find that substantial evidence supports these findings. Moreover, the ALJ's decision generally comports with the analysis set forth in SSR 83-20.

The ALJ was aware that Quimby had been determined disabled based on the earnings record of his deceased spouse, and stated that he "w[ould] not disturb this finding." (AR 24; *see also* AR 1355-56.) Moreover, the ALJ carefully and accurately chronicled Quimby's medical history, as documented in the medical evidence, including considering evidence from before and after the DLI, ultimately finding that Quimby "was not disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date . . . he was last insured o[n] June 30, 1999." (AR 34.) In support of this finding, the ALJ noted that, although Quimby was diagnosed with back strain in 1994, "[h]e was moving better within one week" and was "released to work." (AR 27.) He also noted that Quimby had another injury in January 1995, "but was able to continue [working] on modified duty." (*Id.*) The ALJ further found that, by September 1995, Quimby had developed depression related to his back injury, "but his gait was stable and he had no neurological impairment," and was still able to work. (*Id.*)

The ALJ recognized that Quimby developed a foot problem in 2003, but stated that "the record contains no evidence that [Quimby] had complaints of foot pain [during the insured period]." (AR 32.) Noting that "no treating or examining physician indicated that [Quimby] was disabled or unable to work during the [insured] period," the ALJ placed "significant weight" on the opinions of state agency physicians Drs. Abramson and Frommelt, both of whom found that Quimby retained the RFC to perform light activity during the insured period. (AR 28-29, 32-33.)

A large portion of the ALJ's decision accurately describes evidence from the insured period which documents Quimby's "extensive history of alcohol abuse," including

multiple detoxification attempts and a diagnosis of alcoholic hepatitis. (AR 28-29.) Such evidence provides support for the ALJ's conclusion that, "if [Quimby] had stopped the substance use [during the insured period], . . . there were a significant number of jobs in the national economy that [he] could have performed." (AR 33.) With respect to Quimby's hepatitis C and diabetes, the ALJ accurately noted that, although Quimby underwent treatment for hepatitis using Interferon in 1998, that treatment ended prematurely "due to side-effects and continued alcohol abuse." (AR 28, 221, 227.) Regarding the diabetes, the ALJ stated that Insulin was prescribed in 1999, but Quimby used it only "sporadically." (AR 28, 221, 226.) Finally, the ALJ properly considered Quimby's self-reporting that, in April 2004, nearly five years after the DLI, he "was able to wash dishes, sweep, vacuum, care for his personal needs without assistance, cook and even climb stairs albeit he had to perform this task slowly."[9] (AR 30, 94.) The ALJ also correctly noted that, in April 2004, Quimby reported that he was able to "shop . . . and even fish and hunt." (AR 31, 95, 97.)

For these reasons, the ALJ did not commit reversible error in failing to reference SSR 83-20 and failing to determine a disability onset date. Quimby correctly points out that the Court found differently in its recent ruling in *Plumley v. Comm'r of Soc. Sec.*, No. 2:09-CV-42 (D. Vt. Feb. 9, 2010). This case is distinguishable from *Plumley*, however, for a number of reasons. First and most importantly, in *Plumley*, there were no medical records from the relevant period which documented the claimant's mental health issues. Here, on the other hand, there are ample medical records from the insured period, and they

---

[9] Noteworthy, virtually all of Quimby's self-reporting regarding his pain and limited abilities relates to his condition in 2004, at least four years after the DLI.

reveal that Quimby's most significant and limiting impairment during that period was alcoholism. Second, in *Plumley*, there was evidence that the claimant suffered from a slowly progressive mental illness (PTSD and adjustment disorder) caused by a childhood traumatic event (a house fire) and thus there was ambiguity with respect to the onset date. In contrast, here, Quimby's impairments are mostly physical (back and knee problems, hepatitis C, diabetes, and alcoholism), and the evidence unambiguously supports the ALJ's finding that Quimby's substance abuse was a contributing factor material to the determination of Quimby's disability during the insured period. Third, in *Plumley*, the ALJ made at least two significant erroneous references to the record (*see Plumley*, Doc. 17, Opinion and Order, pp. 19-20), and one of the state physician opinions relied on by the ALJ also contained a significant error (*id.* at p. 24). Such significant factual errors do not exist in the ALJ's decision or the medical evidence relied on by the ALJ in this case.

## Conclusion

For these reasons, I recommend that Quimby's Motion (Doc. 14) be DENIED, and the Commissioner's Motion (Doc. 22) be GRANTED.

Dated at Burlington, in the District of Vermont, this 13<u>th</u> day of April, 2010.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation **within fourteen (14) days** after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all other parties, a written objection which shall specifically identify the portion(s) of the proposed findings, recommendations, or report to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule waives the right to appellate review of the District Court's order entered pursuant to this Report and Recommendation. *See* Local Rules 72(a), 72(c), 73; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a), and 6(d).